| | |
|---|---|
| **MATTHEW THOMAS SMITH** | **CIVIL ACTION** |
| **VERSUS** | **NO. 07-3873** |
| **BLAKE OFFSHORE LLC** | |
| **ET AL.** | **SECTION "L" (4)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.       Factual and Procedural History**

This case arises out of injuries sustained by Matthew Thomas Smith (the "Plaintiff") on August 14, 2006 while the Plaintiff was employed by the Defendant, Blake Offshore, L.L.C. ("Blake") as a floorhand on the Gulf of Mexico aboard the jackup drilling rig BLAKE 303. The BLAKE 303 is owned, controlled and operated by the Defendant.

On July 26, 2007, the Plaintiff filed suit against Blake under the Jones Act, 46 United States Code Section 688, and general maritime law alleging negligence, unseaworthiness of the BLAKE 303 and retaliatory discharge. On October 7, 2008, the Plaintiff was granted leave to amend his complaint, adding a direct action against Blake's insurer, State National Insurance Company. This case came on for a bench trial on December 15, 2008. The parties stipulated that Blake was negligent, the rig was unseaworthy and the Plaintiff was not at fault. The issues remaining for the Court are: the nature and extent of the Plaintiff's damages, medical causation, and whether the facts support a claim for retaliatory discharge.

The Court has carefully considered the testimony of all of the witnesses, the exhibits entered at trial, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that

any findings constitute conclusions of law, the Court hereby adopts them as such, and to the extent that any conclusions of law constitute findings of fact, the Court hereby adopts them as such.

## II.    Findings of Fact

(1)

At all times pertinent hereto, Blake was the owner and operator of the BLAKE 303, a jack-up drilling rig which qualifies as a vessel for Jones Act purposes.

(2)

At all relevant times, Defendant, State National Insurance Company, provided a policy of maritime employer liability coverage which provides coverage to Blake for the allegations of Plaintiff herein.

(3)

On August 14, 2006, the Plaintiff was employed by Blake as a floorhand aboard the BLAKE 303. He was hired by Blake in May of 2006. The Plaintiff was in the course and scope of his employment with Blake as a Jones Act Seaman aboard the BLAKE 303, working with drill collars. On that date, Blake's driller failed to lower the elevators down to a safe level for Plaintiff to reach. The elevators were closed but not locked. As a result, the Plaintiff was standing on tip-toe on the drill collar clamp to reach and pull the elevators, attempting to latch and lock them onto the drill collar lift sub with his body and arms fully extended, but could not get them to lock. As he continued to pull, the Blake driller jerked the draw works upward, jerking Plaintiff's arm, resulting in an injury to his left shoulder, forearm and elbow.

(4)

The parties have stipulated that the incident was caused by Blake's negligence and/or the unseaworthiness of the rig on August 14, 2006 and that the Plaintiff was not at fault.

(5)

The next day, August 15, 2006, the Plaintiff was treated at Business Health Partners Medical Clinic in Sulphur, Louisiana.

(6)

The evaluating physician at Business Health Partners Medical Clinic diagnosed a subscapular and latisimus dorsi strain on August 15, 2006. The physician issued a written order that the Plaintiff return to work in Blake's yard for the next few days and then back to the rig if doing well.[1] The Plaintiff returned to BLAKE 303, but then he was told by Tool Pusher Henry Fulton to report to Blake's yard in Sabine, Pass, Texas. The Plaintiff stayed in Sabine Pass, Texas, working light duty, for the next three months. Smith was paid his regular wages during this time period. In late August, 2006, the Plaintiff received treatment at Tower Medical Center in Nederland, Texas, where an MRI showed some tendinitis of the supraspinatus tendon.[2] The physician stated that he should continue in a sling while he was at work, he should refrain from using the left arm, and he was found fit for light duty only and he was prescribed pain medication.

(7)

In December of 2006, Blake sent Plaintiff back offshore to work on another jack-up rig, the BLAKE 151. Between December 2006 and the beginning of April 2007, the Plaintiff worked 14 day hitches on the BLAKE 151.

---

[1]Ex. 12, p. 10.

[2]Ex. 10.

(8)

On April 11, 2007, Smith began treatment with Dr. Philip Bacilla, an orthopedic surgeon. Dr. Bacilla ordered a MRI arthrogram, which demonstrated an anterior labral tear, a possible biceps tear and degenerative changes in the AC joint. Dr. Bacilla prescribed pain medication, physical therapy, and immobilization by a sling, and restricted Smith to light duty work.

(9)

Because of the restriction, Blake removed the Plaintiff from rig work, instructing him to work light duty at Blake's yard in Broussard, Louisiana starting on April 24, 2007. He would sleep there five days per week and would return home weekends.

(10)

Dr. Bacilla recommended, and on June 19, 2007, performed surgery on the Plaintiff's left shoulder. The procedure was an arthroscopic capsulorrhaphy with repair of a posterior inferior labral tear; subacromial decompression and distal clavicle resection, which involved placing tacks in the bone and suturing the tear back to the bone.

(11)

On July 16, 2007, the Plaintiff saw Dr. Bacilla, and reported that he thought his range of motion limits had been exceeded at Rosewood Physical Therapy on July 13, 2007.

(12)

Until July 19, 2007, the Plaintiff continued working light duty for Blake, while wearing a sling, taking pain medication and attending physical therapy. On July 18, 2007, Blake received a letter of representation from Smith's counsel. On July 19, 2007, Blake's personnel manager Jennings Broussard was advised by Mike Blake that he would not have any man who hires an attorney working for Blake. The Plaintiff was escorted from the property. Mr. Broussard placed

the Plaintiff on leave of absence. The Plaintiff was not told that he was fired, nor was he told that he could return. He was simply ordered off the premises.

(13)

Just over one month after surgery, the Plaintiff found a job at Auto Zone and began working there on August 6, 2007 as a parts sales manager, earning $11 per hour, 40 hours per week. He also began working shortly thereafter at Kerotest Manufacturing Corporation, a plastic valve manufacturer, programming machinery at night for 40 hours per week, earning $11 per hour.  He attempted to work both jobs, Auto Zone during the day and Kerotest from 10 p.m. to 6 a.m. for approximately one month. However, in the beginning of October of 2007, Plaintiff left Auto Zone because his shoulder could not tolerate the overhead reaching required by that job. Since October 2007, Plaintiff has continued working for Kerotest, earning $12.75 per hour working 40 hour weeks.

(14)

Physical therapy continued for approximately six months post-surgery, ending in December of 2007, then was changed to a home exercise program. Smith continued his treatment with Dr. Bacilla. In August, 2008, Dr. Bacilla reported that Smith will likely permanently be restricted to light duty work, with limited lifting to 30 pounds or less to waist level. He is likely to always have some pain and soreness with strenuous activity of the shoulder.

(15)

The Plaintiff earned a General Equivalency Diploma in 1995. He has also attended a two-year program at Louisiana Technical College from 1995 through 1997. Smith only worked for Blake for three months prior to the accident. The Plaintiff's vocational rehabilitation expert, Thomas Meunier, testified that, given Plaintiff's education, training, experience and physical

restrictions, he is suitably employed at Kerotest at $12.75 per hour, and that this is a reasonable estimate of his post-injury maximum earning capacity and maximum skill level based upon his education, interests, skills, aptitudes and residual functional capacity.

### III.   Conclusions of Law

(1)

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims, the Jones Act, 46 U.S.C. § 688, and Rule 9(h) of the Federal Rules of civil Procedure. Venue is proper because the defendant is subject to the personal jurisdiction of this court. The applicable substantive law is the Jones Act and general maritime law of the United States.

(2)

The parties have stipulated Plaintiff's status as a Jones Act seaman. To recover damages from an unseaworthy condition, the plaintiff is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy. *Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir.1972); *see also Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir.1992) (*quoting Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir.1988)) ("To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."). The parties have also stipulated that Blake was negligent, that the BLAKE 303, a vessel owned by Blake, was unseaworthy, and that said negligence and unseaworthiness caused Plaintiff's August 14, 2006 accident and alleged injury. The parties further stipulated that the Plaintiff was not contributorily negligent in causing the accident. Dr. Bacilla testified that the

Plaintiff's injuries are attributable to the accident on August 14, 2006. Thus the matter before the Court is the determination of the nature and extent of the Plaintiff's injuries and resultant damages and whether the facts support a claim for retaliatory discharge.

(3)

Matthew Smith was born on August the 24th of 1977. At the time of the accident, August 14, 2006, he was 28 years old. He was 31 years old at the time of the trial. He is married, and has three children. At the time of trial, Smith had a life expectancy of 46 years and a worklife expectancy of 25.89 years.

(4)

A maritime employer may discharge a seaman "for good cause, for no cause, or even, in most circumstances, for a morally reprehensible cause." *Smith v. Atlas Off-Shore Boat Service, Inc.*, 653 F.2d 1057, 1063 (5th Cir. 1981). However, "a discharge in retaliation for the seaman's exercise of his legal right to file a personal injury action against the employer constitutes a maritime tort." *Id*. A seaman subject to retaliatory discharge is entitled to compensatory damages, including expenses of finding new employment, lost earnings, and damages for mental anguish. *See id*. at 1064. "[T]he seaman is not entitled to double recovery for any element of damages that is compensable both under his personal injury claim and the retaliatory discharge claim." *Id*. at 1064.

The Plaintiff has established that on July 19, 2007, immediately after learning that the Plaintiff had hired an attorney, Blake's then-President, Mike Blake, ordered Blake's Personnel Director, Jennings Broussard, to order the Plaintiff off of Blake's premises because he would have no man working for Blake, after Blake did so much for him, who had filed suit. The Court concludes that the record as a whole demonstrates that Blake was terminated, and that the

termination was "motivated in substantial part by the knowledge that the seaman either intends to file, or has already filed, a personal injury action against the employer. *Smith*, 653 F.2d at 1063-64.

(5)

Under the Jones Act and general maritime law, monetary recovery is allowed for loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-15, at 234. The Court notes that a cure award cannot duplicate tort damages. *Boudreaux v. United States*, 280 F.3d 461, 469 (5th Cir.2002).

(6)

Regarding loss of wages, before computing the Plaintiff's loss of earning capacity, the Court must determine his annual wage earning capacity. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533-34, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); *See e.g.*, *Gates v. Northwest Ins. Co.*, 881 F.2d 215, 218 (5th Cir.1989) (citing *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983)). Marine work is not as predictable as shore side work. It is often affected by weather and the vagaries of the trade. But past history supplies some guidance in determining the Plaintiff's ability and worth in the industry.

(7)

On the date of his injury, August 14, 2006, the Plaintiff was employed by Blake as a floorhand. He earned $18 an hour, and $27 an hour for over-time work, working fourteen (14) days on and fourteen (14) days off. Annualizing the Plaintiff's earnings at the time of his injury computes to $ 59,324.09. Smith, however, testified that his earnings never exceeded $47,000 annually. The Plaintiff expressed interest in receiving a promotion, but the evidence

demonstrates that he worked for Blake for just over three months before the date of his injury and he was not being considered for a promotion at the time of his injury. Thus, the Court finds that it is appropriate to use $48,948.55 dollars per year, his average income from 2006 through the 2007 accident date, as a fair estimate of his wage earning capacity. His net after-tax earnings and fringe benefits will be used as a benchmark for computing Smith's loss of wage earning capacity. *See Norfolk and Western Railway Company v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); *Jones and Laughlin Steel Corporation v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); and *Culver v. Slater Boat Company*, 722 F.2d 114 (5th Cir.1983).

The credible evidence supports the conclusion that as a direct result of his injury of August 14, 2006, Smith suffered a past loss, from the date of injury to trial, of $34,755.51 in income and $3,575.00 in meals. From December 15, 2008, assuming Mr. Smith will continue to work, he will suffer a total future economic loss, reduced to present value by the appropriate below market discount rate, of $362,358.69 in wages and $37,760.97 in meals. See *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983), cert. denied, sub nom. *Reederei v. Byrd*, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984).

Thus the Court finds as a matter of fact and law that Matthew Smith has sustained and will sustain in the future a loss of wage earning capacity including fringe benefits in the total sum of $438,450.17.

(8)

Damages for pain and suffering may be awarded to a seaman who is injured due to the unseaworthiness of the vessel. *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1034 (5th Cir.1984). The Plaintiff has suffered physical pain due to his shoulder injury, surgery, and recovery. He is

likely to have shoulder pain in the future. The Plaintiff also faces significant restrictions in his employment due to his shoulder injury. His treating physician, Dr. Bacilla, has testified that his physical restrictions are permanent and that he will continue to experience some degree of pain. Heaped on this physical pain is his mental anguish and embarrassment for having been wrongfully fired. The Court finds that the Plaintiff is entitled to an award of $100,000.00 for past pain and suffering and $75,000.00 for future pain and suffering. Given the record, the Court finds an award of $175,000 for general damages to be appropriate.

(9)

The Court finds that Blake fulfilled its maintenance and cure obligations to the Plaintiff. The Plaintiff's treating orthopedist, Dr. Bacilla, testified that Plaintiff will likely continue to require nonprescription pain medications and occasional cortisone injections. The Court awards the amount of $10,000 total for future medical expenses.

## IV.    Pre-Judgment Interest

Pre-judgment interest may be awarded in admiralty cases if appropriate, and the Court finds that an order of pre-judgment interest is appropriate in this case. "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 214-15 (5th Cir.2006). However, pre-judgment interest on future damages is not available. *Id.* The starting date and rate of interest is left to the sound discretion of the Court. *See Doucet v. Wheless Drilling Co.*, 467 F.2d 336, 340 (5th Cir.1972); *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 593 (5th Cir.1986), reh'g denied, 811 F.2d 602 (1987). The Court finds that an award of prejudgment interest is warranted on the Plaintiff's past wages and past pain and suffering from the date of judicial demand at the rate of

5.5 percent.

**V.**     **Summary**

On the basis of the foregoing Findings of Facts and Conclusions of Law, the Court finds that the Plaintiff is entitled to recover the following damages:

(1) Past Wage Loss $38,330.51

(2) Future Lost Earning Capacity $400,229.66

(3) General Damages (Past) $100,000

(4) General Damages (Future) $75,000

(5) Future Medical Expenses $10,000.00

Total (excluding interest) $623,560.17

Additionally, the Plaintiff is entitled to pre-judgment interest on the above-mentioned amount of $138,330.51, at the rate of 5.5 percent per annum from the date of judicial demand until satisfied in full, plus all court costs, plus interest on his future damages of $485,229.66 from the date of judgment until paid.

IT IS SO ORDERED.


New Orleans, Louisiana this 17th day of February, 2009.

UNITED STATES DISTRICT JUDGE